IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


JERRI D. BURKE,
      Plaintiff,

vs.                                        Case No. 5:09cv63/SPM/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of the Northern District of Florida pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the Commissioner's findings of fact are supported by substantial evidence and his conclusions of law comport with proper legal principles; thus, the undersigned recommends that the decision of the Commissioner be affirmed.


I.       PROCEDURAL HISTORY

Plaintiff's DIB and SSI applications (Tr. 76–79, 459–61) were denied initially (Tr. 30–31, 462–66) and on reconsideration (Tr. 29, 467–71).[1]  On April 28, 2008, following a hearing held on September 21, 2007, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 17–28).  Plaintiff sought review by the Appeals Council, and she submitted to the Appeals Council additional medical records that were not presented to, or considered by, the ALJ (*see* Tr. 525–32).  After considering the additional evidence provided by Plaintiff, the Appeals Council denied her request for review (Tr. 9–11), making the decision of the ALJ the "final decision" of the Commissioner and subject to judicial review in this court under 42 U.S.C. § 405(g).  Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.[2]

II.     FINDINGS OF THE ALJ

In his April 24, 2008, decision denying benefits the ALJ made the following findings (Tr. 22–28):

1)      Plaintiff met the insured status requirements of the Act through June 30, 2009.

2)      Plaintiff engaged in substantial gainful activity after January 1, 2005, her initial alleged onset date.  20 C.F.R. §§ 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.[3]  Plaintiff's amended alleged onset date is May 15, 2005.[4]

---

[1]  All references to "Tr." refer to the transcript of Social Security Administration record filed on April 20, 2009 (Docs. 13, 14).

[2]  The Appeals Council denied Plaintiff's request for review on November 3, 2008, thus giving Plaintiff until January 7, 2009, in which to initiate this appeal.  *See* 20 C.F.R. § 422.210(c) (providing that appeal "must be instituted within 60 days after the Appeals Council's notice of denial of request for review of the administrative law judge's decision . . . is received by the individual . . ." and that "the date of receipt of notice of denial of request for review [by the Appeals Council] shall be presumed to be 5 days after the date of such notice . . .").  This appeal was filed on February 6, 2009 (Doc. 1), which suggests it was filed out of time.  The record reflects, however, that on February 10, 2009, the Appeals Council granted Plaintiff's request for additional time in which to bring suit, effectively extending the time for filing until March 17, 2009 (Tr. 7).  Given these facts, the court considers this case to have been timely filed.

[3]  In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this Report and Recommendation hereafter should be considered to refer to the appropriate parallel provision, unless otherwise noted.  The same applies to citations of statutes or regulations found in quoted court decisions.

[4]  The court notes that Plaintiff does not directly challenge the ALJ's finding that she was not disabled from January 1, 2005, through December 24, 2006, based on her earnings records for 2005 and 2006 and incarceration from December 25, 2006, through February 12, 2007 (Tr. 22–23; 27).  Regardless, as the ALJ stated that he would "continue

3)      Plaintiff has the following severe impairments:  spinal disorders; amblyopia, right eye 20/50; migraine headaches; obesity; schizoaffective disorder, bipolar type; liver lesion, right lobe; nicotine addiction; asthma; gastroesophageal reflux disease; and history of substance abuse.[5]  20 C.F.R. §§ 404.1520(c) and 416.920(c).

4)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

5)      Plaintiff has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).[6]  Plaintiff experiences visual and auditory hallucinations, including hearing voices about once a week.  She takes medication for her hallucinations that helps.  Plaintiff has moderate restrictions in the ability to work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Although Plaintiff's condition may result in some social difficulties as well as a negative reaction to criticism at times, she shows the ability to relate effectively in general.  She has adequate understanding and adaptation abilities.

6)      Plaintiff is capable of performing her past relevant work as a fast food worker, waitress, and yard worker.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC.  20 C.F.R. §§ 404.1565 and 416.965.

7)      Plaintiff has not been under a disability, as defined in the Act, from January 1, 2005, through April 24, 2008 (the date of the ALJ's decision).  20 C.F.R. §§ 404.1520(f) and 416.920(f).

---

to evaluate the period from the amended onset date of May 15, 2005, through the date of th[e] decision" dated February 24, 2008 (Tr. 23), that is the period the court likewise considers.

    [5]  As set forth below, Plaintiff argues for reversal or remand on the ground the ALJ erred in rejecting part of an examining physician's opinion regarding her auditory hallucinations and failing to consider the hallucinations properly when he determined Plaintiff's ability to work.  As Plaintiff does not challenge the ALJ's findings regarding her physical impairments, any consideration of these impairments by the court in this Report and Recommendation need only be, and is, cursory.

    [6]  The ALJ found that Plaintiff's ability to perform medium work is limited by the capacity to lift and carry up to fifty pounds occasionally and to lift and carry twenty-five pounds  frequently.  The ALJ further found that Plaintiff can stand and/or walk with normal breaks for a total of six hours each in an eight-hour workday.  She can sit with normal breaks for a total of six hours in an eight-hour day.  Plaintiff can occasionally kneel, crouch, crawl, and occasionally climb ladders, ropes, or scaffolds.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and is the result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S EMPLOYMENT, PERSONAL, AND MEDICAL HISTORY[7]

A.      Employment and Personal History

Plaintiff, who was born in 1979, was twenty-eight years of age at the time of the September 21, 2007, administrative hearing (Tr. 539).  She attended special education classes and obtained a high school education.  Plaintiff has past relevant work experience as a fast food worker, waitress,

---

[7] Except as indicated, the information in this section is derived from the opinion of ALJ and references to the record made by Plaintiff in her memorandum.

deck hand, and yard worker (Tr. 88, 521, 565–68). Plaintiff has also worked as a delicatessen clerk at a convenience store, a cashier, a hotel housekeeper, and a dishwasher (Tr. 82, 567). Plaintiff testified that she was simultaneously fired from and quit her last job in 2006 due to her "irritability" (Tr. 540). Also, in 2005 she was fired from a job for punching another employee who had "made [her] mad" (Tr. 541).

In response to questioning by her counsel at the hearing regarding her diagnosis of schizoaffective disorder, Plaintiff testified that she has attempted suicide on four occasions (Tr. 543). Treatment for the disorder has been helpful, according to Plaintiff, but she continues to experience mental problems, including having crying spells six to eight times per month during which she is unable to care for herself or her children (Tr. 544). Plaintiff also reported that she hears voices calling her name; medication reduces the frequency of this symptom, but she continues to hear voices every now and then, or approximately once per week (Tr. 545). Plaintiff takes Klonopin, Seroquel, and Abilify for her mental condition[8]; respectively, these medications cause her to experience sleepiness, an inability to function, and irritability (*id.*). In the past Plaintiff has also been prescribed Depakote and Paxil for her mental condition.[9] Plaintiff also takes Ritalin[10] for attention deficit disorder (Tr. 546–47).

B.     Relevant Medical History

In December 2004 Plaintiff was evaluated by a nurse practitioner in the office of physician Gerald Skipper, M.D., for complaints of anxiety, depression, mood swings, and irritability (Tr. 269). Plaintiff reported that she had experienced these symptoms intermittently for several years and that medication had not been helpful. The assessment was anxiety, depression, and possible bipolar

---

[8] Klonopin is indicated for the treatment of panic disorder. Physicians' Desk Reference, 2759 (2001, 55th ed.). Seroquel is indicated for the management of the manifestations of psychotic disorders. *Id.* at 630–40. Abilify is a psychotropic medication used to treat schizophrenia, bipolar disorder, or agitation associated with either condition. Physicians' Desk Reference, 872–74 (2008, 62nd ed.).

[9] One indicated use of Depakote, which is comprised of sodium valproate and valproic acid ("VPA"), is for the treatment of manic episodes associated with bipolar disorder. Physicians' Desk Reference, 431, 433 (2001, 55th ed.). Paxil is an anti-depressant. *Id.* at 3114.

[10] Ritalin is a mild central nervous system stimulant used in the treatment of attention deficit disorder. Physicians' Desk Reference, 2206 (2001, 55th ed.).

disorder. Plaintiff was prescribed medication and referred to the Apalachee Center for Human Services ("Apalachee") (*see* Tr. 324–25).

Plaintiff underwent a complete clinical psychiatric assessment at Apalachee in February 2005 (Tr. 320–23). Plaintiff reported that she experienced extremely labile moods, which involved episodes of intense anger, "trances," and violent actions such as damaging property and beating other persons for no reason, following which actions she was amnesiac; she also "endorse[d]" that she heard her name being called and was noted as having a history of hypersexuality (Tr. 320, 322–23). Plaintiff reported that she had tried alcohol but did not like it, had used marijuana at age fourteen (which caused hallucinations), and had used cocaine at age twenty-two (Tr. 321). Plaintiff denied any current use of alcohol or illicit drugs (*id.*). She was described as having a long history of mood disturbance with violent tendencies and antisocial behaviors (Tr. 323). Plaintiff's diagnosis was bipolar disorder, mixed, with a Global Assessment of Functioning ("GAF") score estimated to be 50 at that time (*id.*).[11] Plaintiff was prescribed several medications, including Seroquel (*id.*). In April 2005 Plaintiff reported that she had been "doing very well" until she missed an appointment and ran out of her prescriptions. While medicated, she had felt "really mellow . . . not getting angry or easily aggravated as before. Now she is losing her temper again and got into a fist fight with a relative last weekend. The voices had become rare and nonbothersome but have now reoccurred as well." (Tr. 319). According to a treatment note from May 2005, after being back on medication one day Plaintiff had been arrested and spent three days in jail—evidently without medication—during which time she had "lost it" with corrections staff (*id.*). At Plaintiff's May 2005 Apalachee visit her Seroquel was increased, and she was also placed on Zoloft[12] (*id.*). A treatment noted from June 2005 indicates Plaintiff reported that she was doing better on the increased dose of Seroquel, stating that it had "taken a lot of the edge off" and that she was no longer hearing voices or noises, although she still heard music (Tr. 318). Plaintiff was sleeping better, her moods had stabilized, her affect was

---

[11] The GAF is a rating of overall psychological functioning on a scale of 0–100. Diagnostic and Statistical Manual of Mental Disorders 34 (2000, 4th ed., text revision) ("DSM-IV-TR"). A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR 32.

[12] Zoloft is indicated for the treatment of depression, obsessive-compulsive disorder, panic disorder, and post-traumatic stress disorder. Physicians' Desk Reference, 2553–54 (2001, 55th ed.).

bright, and her thinking was more organized (*id.*).  In August 2005, however, Plaintiff reported that on the increased Seroquel dosage she was more agitated and irritable and not sleeping as well as she had on the lower dose; she also had trouble sitting still, although this was noted to be a lifelong behavior (Tr. 317).  Plaintiff was continued on Zoloft, but her Seroquel was decreased (*id.*).

At the request of the Office for Disability Determination, on October 24, 2005, psychologist George L. Horvat, Ph.D., performed a mental evaluation of Plaintiff (Tr. 287–89).  Plaintiff reported to Dr. Horvat that she experienced depression two or three days a week and that her mood fluctuated, changing from feeling "expansive," to "crash[ing]," and then feeling "hyper" (Tr. 287).  Her self-reported history included attendance in special education classes due to her bad temper, an "arrest for being with a girl who was shoplifting," marriage, and two children (Tr. 288).  Plaintiff denied any history of drug abuse (*id*).  Plaintiff informed Dr. Horvat that she could not hold a job because of her attitude and that she received treatment for mental and emotional problems, including taking Zoloft and Seroquel.  Dr. Horvat described Plaintiff as alert, tall, obese, and neatly and cleanly dressed, with normal hygiene and grooming.  He noted that Plaintiff exhibited no signs of physical impairment, but that her motor activity was agitated: she constantly bounced her leg.  According to Dr. Horvat, Plaintiff's attention was distractible, her concentration was preoccupied, her memory was normal, she was oriented times four, and her eye contact was normal.  Plaintiff's facial expression, as well as her mood and affect, appeared to be depressed.  Plaintiff's rate of speech was normal, her content of speech and thought were relevant and coherent, and her organization was goal-directed.  She appeared to be of above-average intelligence, with an average fund of knowledge.  "Her abstraction was normal, her judgment was commonsensical, her reality testing was unaware, her insight was unaware, and her decision making was impulsive" (*id.*).  Plaintiff reported that her main stressor was her illness.  Dr. Horvat noted that Plaintiff's coping ability skills seemed to be deficient, with deficits in the areas of interpersonal relationships and self control.  Although Plaintiff "showed no signs of preoccupations," she reported having "both auditory and visual hallucinations" (*id.*).  According to Plaintiff, she started seeing shadows and hearing voices when she was about seventeen years of age.  In response to being asked if she thought there was anything wrong with her, Plaintiff responded, "'People shouldn't get as mad as I do'" (*id.*).

Plaintiff was also asked if she thought she was impaired; she responded, "'Anything you can do I can do better' is my motto" (*id.*). Dr. Horvat's diagnosis was bipolar I disorder. Regarding Plaintiff's prognosis, Dr. Horvat opined that since Plaintiff was "having problems with hallucinations as well as mood disorder, she is in need of pharmacological medical management and psychotherapeutic treatment. Until she is stabilized, it will be difficult to find an occupation that is appropriate for her" (Tr. 289). Dr. Horvat also noted that "[s]hould the claimant be found to be entitled to SSI payments, it is felt that she is not capable of managing her funds" (*id.*).

Iqbal A. Faruqui, M.D., an internist, examined Plaintiff in November 2005 (Tr. 290).[13] Dr. Faruqui noted that Plaintiff was obese and had "multiple medical problems none of which [were] serious" and which were "well controlled" (Tr. 293). He opined that Plaintiff had no disabling medical problems (*id.*).

A January 2006 Apalachee treatment note indicates that Plaintiff was sleeping well and hearing noises only infrequently; her temper remained volatile, however, although she had not acted out recently (Tr. 316). Her VPA level was low,[14] but Plaintiff insisted she had been compliant with her medication (*id.*). Plaintiff's Zoloft and Seroquel were continued without change, and her dosage of Depakote was increased (*id.*).

Commencing in March 2006 nurse practitioners at Linzey R. Faison and Associates, Inc., ("LRFA") provided Plaintiff with mental health care (Tr. 492–519). Plaintiff's initial mental status examination appears to have unremarkable in numerous aspects, although it is noted that a recurrent theme of Plaintiff's speech was anger/suspiciousness and that her mood was elevated, with irritability and paranoia present (Tr. 516–17). Plaintiff was provisionally diagnosed with mood disorder. Plaintiff's treatment plan included the continued use of Seroquel and the initial use of Abilify for "mood/possible [auditory hallucinations]/paranoid thoughts" (Tr. 517). Plaintiff's records reflect that she was a "no-show, no-call" for an April 13, 2006 appointment (Tr. 494). Plaintiff reported on April 25, 2006 that, compared with the recent week in which she had missed

---

[13]   Dr. Faruqui's first examination of Plaintiff was at the Commissioner's request. Plaintiff later became Dr. Faruqui's patient (*see* Tr. 410–58).

[14]   *See* note 9, *supra*.

an appointment and had not taken her medications, she felt "'so much better'" on her medications with respect to sleeping and mood (Tr. 509). Even though Plaintiff reportedly had been "assaultive toward another person," her condition was described as "improved" and her current affect as "bright" (Tr. 508). Plaintiff was advised to continue taking Seroquel and to increase her dosage of Abilify (*id.*).

Plaintiff was seen at LRFA three times in May 2006 (Tr. 500–06). At her second visit Plaintiff reported "significant improvement" on the dosages of Seroquel and Abilify she was taking, and her affect was described as "bright" and "engaging" (Tr. 503). Based on her report that she was experiencing difficulty focusing and concentrating, Plaintiff was placed on a trial dose of Ritalin, a medication she had used in the past for attention deficit disorder (*id.*). At her third visit in May 2006, Plaintiff reported that overall her symptoms had improved, including with respect to sleep, appetite, energy, mood, feelings of joy and pleasure in life, concentration, motivation, irritability, and anxiety (Tr. 500). There was no change with respect to memory. Plaintiff described herself as more focused; she also indicated she was better able to control her appetite, had cleaned and organized her house, gotten things done without becoming angry, worked on a handcraft project for two hours, and watched an entire movie (Tr. 501).

In June 2006 Plaintiff again reported to an LRFA nurse practitioner that overall her mental status was improved, including with respect to sleep, appetite, energy, mood, feelings of joy and pleasure in life, concentration, motivation, irritability, anxiety, and libido; there was no change in memory (Tr. 498). Plaintiff indicated she was suffering no adverse effects with her current medications (i.e., Seroquel, Abilify, and Ritalin) (*id.*). Plaintiff was described as "clinically improved," with a "bright" and "engaging" affect (Tr. 499). A September 7, 2006, note states that Plaintiff had called to report she would miss her appointment that date because she was starting a new job (Tr. 497). In October 2006 Plaintiff went to the office of LRFA to obtain a renewal of her Ritalin prescription; she also indicated that she was experiencing increased stress, especially with respect to her new position (*id.*). Plaintiff was not examined in October 2006, but prescriptions for Ritalin, Seroquel, and Abilify were written, with the Abilify dosage increased "to facilitate more stable mood" (*id.*).

The next record of Plaintiff's treatment at LRFA is dated February 20, 2007 (Tr. 496). Plaintiff reported that since her last visit her appetite, energy, mood, feelings of joy and pleasure in life, concentration, motivation, irritability, anxiety, memory, and libido were unchanged or had worsened (Tr. 496). Plaintiff also reported having an altercation with the police which resulted in her incarceration from December 25, 2006, to February 12, 2007 (Tr. 495). A March 15, 2007, note states that Plaintiff had suffered no hallucinations since being back on Abilify recently, though her mood swings continued (Tr. 494). She reported that she had been illicit drug-free for two to three years (*id.*). Plaintiff was instructed to increase her dosages of Ritalin and Abilify (*id.*). In April 2007 Plaintiff reported that her sleep, appetite, energy, mood, feelings of joy and pleasure in life, concentration, memory, motivation, irritability, anxiety, and libido were improved or unchanged (Tr. 492). Plaintiff also reported that she was living with her mother and step-father at that time and that she had applied for SSI. (Tr. 493). Plaintiff was instructed to continue taking Ritalin, Seroquel, and Abilify; she was also prescribed Klonopin (*id.*)

In May 2007 Plaintiff completed a medical questionnaire prior to resuming treatment at Apalachee (Tr. 488–90). Also in May 2007 Plaintiff obtained a refill of Ritalin from Dr. Faruqui (Tr. 417). In a June 14, 2007, treatment note Dr. Faruqui indicated that, among other conditions, Plaintiff suffered from bipolar disorder (Tr. 415). According to Dr. Faruqui, currently Plaintiff was on no medications for her psychological problems (*id.*). He prescribed Depakote and Seroquel, as well as additional medications for other conditions (Tr. 416). One week later, on June 21, 2007, Plaintiff underwent a psychiatric evaluation at Apalachee (Tr. 477). Plaintiff stated that "'I need to get back on my meds,'" and she identified Klonopin, Abilify, Seroquel, and Ritalin as her prescriptions (*id.*). Plaintiff also reported that she would not be seen at LRFA any longer because the treatment providers there thought she had abused her medications, even though Plaintiff maintained that her medications had been stolen, not abused (*id.*). According to Plaintiff, she elected to leave the practice because of the accusation of medication abuse and the refusal to continue to prescribe Ritalin for her (*id.*). The evaluator discussed Plaintiff's current reported medications, recommending that Plaintiff increase her Abilify and Seroquel dosages to stabilize her mood and treat her psychosis. Plaintiff was informed that the use of Ritalin was not indicated because it could

increase her psychosis and make her mood lability worse (Tr. 480). Plaintiff acknowledged having auditory hallucinations, which were "better" when she took Abilify, but she reported that "even when she was taking meds she still had" auditory hallucinations and mood lability (*id.*). Plaintiff's diagnosis was schizoaffective disorder, bipolar type, "currently hypomanic [tending] towards manic," and her GAF score was estimated to be 55–60[15] at that time (*id.*). Prescriptions for Klonopin, Abilify, and Seroquel—but not for Ritalin—were dispensed (*id.*).

Plaintiff presented to Dr. Faruqui on August 1, 2007 (Tr. 410). Dr. Faruqui's handwritten notes are largely illegible but it appears Plaintiff complained of "bad nerves" and asked to have her psychological medications refilled. Dr. Farqui's diagnoses were "non-compliance" and "mood disorder" (*id.*). Plaintiff also sought treatment at Apalachee on August 1, 2007, when she reported that her "'mood swings [were] much better,'" and she was sleeping well (Tr. 475). She denied any auditory hallucinations or delusions and reported that her paranoia had decreased significantly, perhaps to one episode a week (*id.*). Plaintiff's primary diagnosis was schizoaffective disorder, bipolar type. She was prescribed Abilify, Seroquel, and Klonopin (*id.*). Plaintiff requested a prescription for Ritalin but this was refused, at least until her mood lability and psychotic symptoms were completely under control, due to concerns about the medication's possible adverse effects (Tr. 476).

C.     Other Information Within Plaintiff's Administrative File

A non-examining State agency psychologist, J. Patrick Peterson, Ph.D., J.D., opined in a Psychiatric Review Technique form dated November 21, 2005, that Plaintiff had no severe mental impairments (Tr. 294). Dr. Peterson noted that at that time there were only two recent mental health contacts of record, in December 2004 and February 2005 (Tr. 306). He additionally noted that the October 2005 consultative examination (performed by Dr. Horvat) was "contraindicative of any diagnosable mental [disorder] beyond transient Adjustment Reaction w/Mixed Disturbance Emotions & Conduct arising [within] a rather labile/unstable/cyclothymic & hysterical/histrionic/melodramatic individual (accompanied by [self-reported auditory and visual]

---

[15] A GAF score between 51 and 60 indicates moderate symptoms or moderate impairment in social, occupational, or school functioning. DSM-IV-TR 34.

hallucinations & other indicators of likely [symptom] exaggeration/malingering in pursuit of secondary gain)" (Tr. 306).

Thomas Conger, Ph.D., completed a Psychiatric Review Technique form on March 3, 2006 (Tr. 334–47). Dr. Conger opined that Plaintiff suffered from affective disorder, as evidenced by symptoms of bipolar syndrome (Tr. 337). According to Dr. Conger, Plaintiff had no limitations with respect to episodes of decompensation; mild limitations with respect to the restriction of activities of daily living and with respect to difficulties in maintaining concentration, persistence, or pace; and moderate difficulties with respect to maintaining social functioning (Tr. 344). Dr. Conger outlined Plaintiff's psychiatric history, concluding that she "currently displays an overall adequate Mental Status, with no significant cognitive deficits noted" (Tr. 346). Dr. Conger also completed a Mental Residual Functional Capacity Assessment in which he opined that Plaintiff had no significant limitations, except for moderate limitations with respect to her ability (1) to work in coordination with or proximity to others without being distracted by them; (2) to accept instructions and respond appropriately to criticism from supervisors; and (3) to get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. 349).

The administrative record also contains evidence that was presented to the Appeals Council but that was not seen by the ALJ.[16] This evidence reflects that Plaintiff presented to the Life Management Center in December 2007 for an initial mental health assessment (Tr. 525). Symptoms that were noted to be "marked" or "repeated" included auditory hallucinations, reported history of memory lapses when angry, and overeating when depressed; Plaintiff also experienced visual hallucinations occasionally (Tr. 525–26). Plaintiff's diagnoses were bipolar II disorder and conduct disorder, with a current GAF score of 55 (Tr. 530). Counseling, medication management, and anger management were advised (Tr. 529). Plaintiff was assessed again at the Life Management Center in April 2008 (Tr. 531–32). This assessment appears to follow the December 2007 evaluation closely, with Plaintiff's diagnoses unchanged. Abilify, Seroquel, and Klonopin were prescribed;

---

[16] Plaintiff does not assert that the additional records submitted to the Appeals Council meet the standard for remand under sentence four of 42 U.S.C. § 405(g) or that the Appeals Council erred with regard to its consideration of those records. The court includes a summary of this evidence merely for purposes of context and completeness.

Plaintiff was also given a prescription for Ritalin at that time (Tr. 532).

V.    DISCUSSION

        Plaintiff contends the ALJ erred in partially discounting Dr. Horvat's opinion that her mental condition needed to be stabilized before she could work.  More specifically, Plaintiff argues that the ALJ improperly discounted Dr. Horvat's opinion on the grounds that she had a history of frequent treatment noncompliance and continued work.[17]  According to Plaintiff, the ALJ's error resulted in his omitting Plaintiff's hallucinations from the RFC determination and failing to properly consider the testimony by the vocational expert ("VE") that Plaintiff's ability to work could be impacted if the hallucinations occurred during the workday.  The Commissioner responds that the ALJ's findings regarding Dr. Horvat's opinion and Plaintiff's RFC are supported by substantial evidence and thus should be affirmed.  According to the Commissioner, the ALJ thoroughly evaluated the opinion of  Dr. Horvat and provided a reasoned basis for the weight his opinion was assigned.  Additionally, the ALJ properly considered Plaintiff's hallucinations and included all credible effects of Plaintiff's mental impairments in his RFC determination and in the hypothetical question posed to the VE.

        A.    The ALJ's Rejection in Part of Dr. Horvat's Opinion

        When considering the testimony of a treating physician or other acceptable treating source, the ALJ ordinarily must give such testimony substantial or considerable weight.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The opinion of a one-time examining physician—or psychologist such as Dr. Horvat

---

        [17] After summarizing the medical evidence regarding Plaintiff's mental conditions, the ALJ concluded that when Plaintiff was "compliant with medication, she is apparently stable" (Tr. 26).  The ALJ also noted that Plaintiff had "exhibited a tendency to doctor shop to obtain the Ritalin which her Apalachee therapists feel increase her psychosis" (id.).  Further, the ALJ concluded, based on the medical record Plaintiff had "a history of non-compliance with her medications, as well as missing follow-up appointments once she is prescribed medications" (id.).  Assessing Dr. Horvat's opinion "on the need to stabilize Plaintiff before she can work," the ALJ concluded that this opinion was " offset by Plaintiff's continuing work history and [ ] frequent non-compliance[;] however[,] great weight is given to the rest of his examination" (Tr. 27).  The ALJ also accorded great weight to the mental health opinions of Dr. Faruqui and Dr. Conger because they were consistent with the record as a whole.  The ALJ gave substantial weight to the Apalachee and LRFA treatment records because they provided a longitudinal record of Plaintiff's course of treatment for her mental health conditions.  The ALJ concluded that even though Plaintiff did have "some valid mental health impairments . . . as long as she remains compliant with her medications, she is stable and employable" (id.).

in this case—is not entitled to the same deference, however. *See* <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1160 (11th Cir. 2004). With respect to either a treating or an examining source's testimony, good cause exists to discredit the testimony when it is contrary to or unsupported by the evidence of record. *See* <u>Phillips</u>, 357 F.3d at 1240–41. Thus the ALJ may reject the opinion of an examining source when the evidence supports a contrary conclusion. *See* <u>Sryock v. Heckler</u>, 764 F.2d 834, 835 (11th Cir. 1985). Provided the ALJ articulates specific reasons for refusing to accept the source's opinion and those reasons are supported by substantial evidence, there is no reversible error. <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1212 (11th Cir. 2005). Accordingly, in this case, while Dr. Horvat's opinion may have been due some weight, the ALJ was not required to give it controlling weight. Moreover, the ALJ was entitled to discount Dr. Horvat's opinion as long as he gave specific reasons, supported by the record, for declining to accept the opinion in its entirety. As explained below, the court concludes that the ALJ satisfactorily did so.[18]

The court first addresses Plaintiff's challenge to the ALJ's conclusion she was noncompliant with treatment. In support of her argument that the ALJ erred in this regard, Plaintiff points to the record which she says reflects her active, compliant treatment immediately prior to and at the time of Dr. Horvat's examination. According to Plaintiff, despite this ongoing treatment her condition was not stable since she continued to experience auditory hallucinations and mood fluctuations (Doc. 21 at 12). The record prior to Dr. Horvat's examination, however, reflects that Plaintiff was not fully compliant with her treatment and that when she was relatively compliant her symptoms improved. For example, an April 2005 note indicates that while Plaintiff had been doing well on the medications ordered in February 2005, including a significant diminution in her reported auditory hallucinations, she had recently missed an appointment and run out of her prescriptions, after which her mood disorder symptoms increased and her hallucinations recurred (Tr. 319). Additionally, a May 2005 treatment note indicates that although Plaintiff had recently been arrested and spent a few days in jail, during which she "lost it" with corrections staff, she had been off her

---

[18] Plaintiff offers numerous arguments in support of her contention that the ALJ erred in discounting Dr. Horvat's opinion. In order to conclude that substantial evidence supports the ALJ treatment of Dr. Horvat's opinion, the court need not, and does not, address each and every one of Plaintiff's arguments.

medications and had only been back on them one day at the time of her arrest; while not clear from the record, it appears she also did not take her medications while incarcerated (Tr. 319). In June 2005 Plaintiff reported that she was doing better on an increased dosage of Seroquel, including no longer hearing voices or noises (although she reported still hearing music) (Tr. 318). Also, while Plaintiff stated in August 2005 that the increased dosage of Seroquel affected her mood, making her somewhat more agitated and irritable, she did not report any hallucinations.

In providing her medical history to Dr. Horvat in October 2005, Plaintiff reported that she experienced hallucinations and mood swings, for which she was prescribed medication (Tr. 287–89). Dr. Horvat's evaluation does not, however, address whether or not Plaintiff was compliant with her drug regimen, an issue which her prior medical records suggest was becoming a recurring concern. Additionally, although the evaluation mentions in some detail Plaintiff's description of her current mood problems, it says little with respect to current complaints, if any, of visual or auditory hallucinations. Moreover, although Dr. Horvat thought that Plaintiff "appeared to be a reliable informant" about her medical history, the ALJ questioned the credibility of Plaintiff's allegations concerning the severity of her mental conditions (Tr. 26). The ALJ noted that to Dr. Horvat Plaintiff had denied any history of substance abuse but that to an LRFA practitioner she had reported being drug-free for the prior two to three years (Tr. 494); additionally, the record reflects that in February 2005 Plaintiff told an Apalachee practitioner that she had used cocaine when she was twenty-two years old (that is, in 2001) (Tr. 321). Thus, as the ALJ noted, despite her representation to Dr. Horvat that she had not used any illicit drugs in the past, Plaintiff acknowledged to others that in fact she had done so.

Plaintiff also relies on the records from Apalachee following Dr. Horvat's examination to support her contention that her condition did not stabilize despite compliance with treatment (Doc. 21 at 12–13). But the Apalachee records show, again, that when Plaintiff was consistently compliant with treatment she did fairly well and that when she was noncompliant she did not do well. For example, in January 2006, Plaintiff reported to an Apalachee practitioner that she was sleeping well and hearing noises only infrequently, although she claimed her temper remained volatile (Tr. 316). When Plaintiff resumed treatment at Apalachee in June 2007, she indicated that she had recently

been off her medications and needed to get back on them. In August 2007, after having taken her medications, Plaintiff reported significant improvement with respect to her mood swings, sleep, and paranoia (Tr. 475); she also denied auditory hallucinations or delusions altogether (*id.*).

Plaintiff also contends that the records from Apalachee and LRFA, which the ALJ accorded substantial weight, demonstrate temporary improvement and later relapses or reoccurrences of hallucinations, which further demonstrate her lack of stabilization despite treatment. In the court's view, however, the record reflects that the times Plaintiff suffered relapses or reoccurrences were the times she was not compliant with her treatment. In April 2006, for example, Plaintiff reported that, compared with a recent time in which she had missed an appointment and not taken her medications, she felt significant improvement; the practitioner also described Plaintiff's condition as improved (Tr. 509). Plaintiff likewise reported improvement in May 2006 and June 2006 while maintaining her treatment regimen (*see* 499–503). In September 2006, Plaintiff missed an appointment due to starting a new job, but she appeared the following month to obtain refills of her prescriptions, which included a recommendation that she increase her dosage of Abilify to help deal with job-related stress (Tr. 497). The October 2006 notation does not refer to any reports by Plaintiff that she was experiencing hallucinations or any recommendation that Plaintiff should not work or opinion that she was unable to work due to mood problems or hallucinations (*id.*). Plaintiff apparently was not seen again at LRFA until February 20, 2007 (Tr. 496), when she reported having been incarcerated from December 25, 2006, to February 12, 2007, after a confrontation with police (Tr. 495). By the date of her next appointment, in March 2007, after Plaintiff had been taking Abilify for several weeks, she again reported that she had suffered no hallucinations; although Plaintiff's mood swings continued and she was told to increase the dosage of Abilify, there is no report of any additional violent outbursts (Tr. 494). In April 2007 Plaintiff reported improved or unchanged symptoms with respect to sleep, appetite, energy, mood, feelings of joy and pleasure in life, concentration, memory, motivation, irritability, anxiety, and libido (Tr. 492). By June 2007, however, Plaintiff again was off her medications (Tr. 415) and again requesting that she be placed back on them (Tr. 477). In August 2007, after Plaintiff had again been taking her medications for several months, she reported improvement with respect to her mood swings, denied any auditory

hallucinations or delusions, and reported that episodes of paranoia had decreased significantly (Tr. 475). The medical history outlined in these records suggests that Plaintiff was not particularly compliant with her treatment recommendations and when her compliance improved, the symptoms of her mental conditions did as well.

Plaintiff also asserts that the ALJ's conclusion that she was *frequently* noncompliant with treatment is not supported by the medical evidence; further, even when admittedly she was noncompliant, it was only for brief periods of time (Doc. 21 at 13). With respect to both contentions, as discussed above, the record reflects otherwise: Plaintiff in fact was suspected of, admitted, or was shown to be noncompliant with her medication recommendations repeatedly (*see, e.g.,* Tr. 316, 319, 410, 416, 494, 497, and 509), and she seems to have remained noncompliant for periods as long as three to four weeks—even based on Plaintiff's reckoning (*see* Doc. 21 at 13–14)—which, given her demonstrated need for treatment on a regular basis, was significant (*see, e.g.,* Tr. 477, 531). Plaintiff additionally contends that despite being compliant with her medications she continued to report mood swings and auditory hallucinations. First, as the court has noted, the medical record shows that Plaintiff was not always faithful with treatment. Moreover, although at times Plaintiff did report continued hallucinations and other symptoms while on treatment, when she was consistently compliant with taking her medications she generally reported milder symptoms or significant improvement in her symptoms, including with respect to hallucinations and mood swings. As to Plaintiff's contention that the Ritalin she was prescribed may have exacerbated her underlying psychological impairments, the record reflects that this medication was withdrawn—on a trial or temporary basis—due to the concern it had the potential to exacerbate her underlying psychological impairments, not that it in fact had been demonstrated to do so. Thus Plaintiff's assertion is based on speculation, not the record. Moreover, simply because Plaintiff's medications may have been changed or adjusted periodically does not support the contention that her mental condition was not stable even with treatment.[19]

---

[19] Plaintiff also submits that the evidence of continuing symptoms is "*consistent with the VE's testimony that, 'dealing with bipolar and schizophrenia, sometimes medication helps that condition but sometimes even with medication and if they're complying [ ] they still can't over come it . . .'*" (Doc. 21 at 14–15). To the extent Plaintiff seeks to rely on the medical opinion of the VE, for obvious reasons her reliance is misplaced.

Noncompliance with treatment is an appropriate basis on which to assess a claimant's entitlement to disability benefits, as a "medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quotation and footnote omitted). The evidence outlined above indicates that Plaintiff's mental condition could reasonably be remedied by consistent compliance with a regimen of prescribed medications and that Plaintiff repeatedly was noncompliant with recommended treatment. The court concludes that substantial evidence therefore supports the ALJ's findings that when Plaintiff was "compliant with medication, she is apparently stable" and that she had "a history of non-compliance with her medications . . ." (Tr. 26). Consequently, the court further is satisfied that the ALJ's conclusion that Dr. Horvat's opinion should be "offset," or discounted, in light of these circumstances is likewise supported by substantial evidence (Tr. 27).

Next, the court considers whether ALJ was entitled to partially discount Dr. Horvat's opinion based on Plaintiff's continuing work history.[20] The court concludes he was. The record reflects that Plaintiff filed a Form 1040 for tax year 2005 reporting business income of $6600.00 earned as a self-employed house cleaner; she also reported other wages of $762.00, or a total income of $7362.00 (Tr. 65–69). Plaintiff's official earnings record is somewhat different, reflecting income of $6858.00 for 2005 ($6096.00 from self-employment and $762.00 from Express Lane, Inc.) (Tr. 70, 74). Plaintiff's earnings record for 2006 shows that she received $2178.40 from Bennett Eubanks Oil Company, Inc. (third quarter earnings of $990.00 and fourth quarter earnings of $1188.00) (Tr. 71, 75). Citing 20 C.F.R.§§ 404.1560(a)(1), 404.1573(c), and Social Security Ruling 83-33, Plaintiff contends that the self-employment work she performed in 2005 involved "special conditions" and therefore should not be considered substantial gainful activity or past relevant work. Regardless of whether Plaintiff's argument has merit—a proposition the court deems unlikely given the lack of

---

[20] The ALJ noted that Plaintiff had reported FICA earnings of $6858.00 in 2005 ($6096.00 through self-employment as a yard worker) and $2178.40 in 2006, as a cashier at a gas station (Tr. 22, 27). The ALJ noted that Plaintiff also testified that she worked for her father through May 15, 2006, although her earnings report does not reflect any such income (Tr. 22).

any evidence in support[21]—the records of Plaintiff's other earnings in 2005 and 2006 are sufficient to provide additional support for the ALJ's determination that Dr. Horvat's opinion should be partially discounted.

In summary, the court concludes that, based alone on the evidence of Plaintiff's noncompliance with treatment, the ALJ was entitled to discount Dr. Horvat's opinion that Plaintiff needed to be stabilized before she could work. Additionally, the ALJ was entitled to consider Plaintiff's continuing work history in partially discounting Dr. Horvat's opinion.

B.      The ALJ's Consideration of Plaintiff's Hallucinations

Plaintiff also argues that "[t]he ALJ's failure to properly consider Dr. Horvat's opinion resulted in the erroneous omission of [Plaintiff's] hallucinations from the RFC determination" (Doc. 21 at 15). More specifically, Plaintiff contends the ALJ failed to properly consider the VE's testimony that Plaintiff could not work if her auditory hallucinations occurred during work hours (*id.*).

As an initial matter, as discussed previously, the ALJ was entitled to discount Dr. Horvat's opinion. Moreover, the ALJ did not omit Plaintiff's hallucinations from his RFC determination. Rather, in finding that Plaintiff retained the RFC to perform medium work, with certain restrictions to accommodate her physical and mental impairments, the ALJ specifically noted that Plaintiff has "[auditory] and visual hallucinations, hearing voices about once a week and she is on medication that helps" (Tr. 24).

Although the testimony of a VE is not required at step four of the sequential analysis, *see* Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990), the Regulations nevertheless permit

---

[21] Plaintiff testified that her self-employment wages involved doing yard work for her father, who "paid [her] when he could" (Tr. 555). According to Plaintiff she worked for her father in 2005 for five to six hours each day for a period of three or four months (Tr. 556). Section 404.1573(c) explains that work may be performed under "special conditions" that take into account a claimant's impairment, such as work done in a sheltered workshop or as a patient in a hospital; if work is performed under "special conditions" the Commissioner may determine the work did not constitute substantial gainful activity. Plaintiff's work for her father involved neither of the special circumstances described in § 404.1573(c). Even if Plaintiff's work nevertheless was considered to have been performed under special conditions, however, § 404.1573(c) also provides that such work in fact "may show that you have the necessary skills and ability to work at the substantial gainful activity level." The latter situation may be the case here, where Plaintiff apparently performed yard work successfully in 2005, for as many as six hours per day for up to four months, as well as through May 15, 2006.

an ALJ to obtain VE testimony to assist him in making the determination of whether a claimant is able to return to past relevant work. *See* 20 C.F.R. § 404.1560(b)(2); 20 C.F.R. § 1520(a)–(g). Here, the ALJ did so, posing a hypothetical question to the VE which asked him to assume an individual of Plaintiff's age, education, and prior work history who was limited to performing medium work, with certain restrictions.[22] When asked by the ALJ whether there would be jobs which an individual of that description could do, the VE testified the individual would be able to perform Plaintiff's past relevant work as a fast food worker, waitress, and yard worker (Tr. 569). The ALJ then told the VE to assume the individual also experiences visual and auditory hallucinations, hearing voices about once per week, for which she takes medication. The ALJ asked whether this additional restriction would change the VE's answer to the prior hypothetical question. The VE responded, "Probably not, Your Honor, it all depends on what time of day, you know, it's eight hours of the work day, she can hear the voices at night or something or per week, probably, unless it affected her ability to work, you know, if it happened during the work hours" (Tr. 570).

According to Plaintiff, the ALJ's finding that she could work despite experiencing auditory hallucinations once per week implies that her hallucinations would not occur during the workday, but nothing in the record indicates that the hallucinations occur outside of work hours (Doc. 21 at 15). The court concludes, however, that the ALJ did not fail to properly consider the VE's testimony. First, the VE's testimony was extremely limited and also rather equivocal. Nevertheless,

---

[22] These restrictions included the ability to

occasionally lift up to 50 pounds, frequently lift 25 pounds. Also the same for carrying. Stand and/or walk about six hours in an eight hour day, same for sitting. This person can occasionally climb ladders, ropes and scaffolds. And can occasionally kneel, crouch and crawl. No other physical restrictions. [There also are] "some moderate restrictions in the area of the ability to work in coordination with or proximity to others without being distracted by them. To accept instruction and respond appropriately to criticism from supervisors. Get along with co-workers or peers without distracting them or exhibiting behavior extremes, those three areas are moderate. [Additionally], although the individual's condition may result in [some] social difficulties as well as a negative reaction to criticism at times, let's assume the individual shows the ability to relate effectively in general [and] have adequate understanding and adaptation abilities.

(Tr. 568–69).

it appears his opinion was that if the hallucinations occurred during work hours and affected the individual's ability to work, his opinion might change. As noted above, through step four of the sequential analysis it is the claimant's burden to establishing the existence of a severe impairment that keeps her from performing her past relevant work. 20 C.F.R. § 404.1512. Plaintiff points to no evidence, however, that indicates her hallucinations occurred during work hours or, more importantly, that they ever affected her ability to work. To the contrary, the evidence suggests it was Plaintiff's volatile temper—which worsened significantly when she was not compliant with her medications—that resulted in altercations with others (including family members, co-workers, law enforcement officers, and corrections staff) and thus affected her ability to work. The court is aware of nothing in the record that indicates Plaintiff's hallucinations might or in fact did impact her ability to work, other than perhaps Dr. Horvat's suggestion, which the ALJ properly discounted.

The court therefore concludes that the ALJ did not err in making his RFC determination, including with respect to his consideration of the VE's testimony.

VI.     CONCLUSION

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to **CLOSE** the file.

At Pensacola, Florida this 28th day of January 2010.



                                        /s/ Elizabeth M. Timothy_____
                                        **ELIZABETH M. TIMOTHY**
                                        **UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).